UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LEWIS JOHN #341735,<br><br>    Plaintiff,<br><br>    v.<br><br>DEPUTY MARK C. BERRY, DEPUTY KRISTAIN NORDSTROM, DEPUTY HARDESTY,<br><br>    Defendants. | Case No. C05-5694RJB-KLS<br><br>REPORT AND RECOMMENDATION<br><br>Noted for December 8, 2006 |

This matter has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4. This matter comes before the undersigned on defendants' converted motion for summary judgment. (Dkt. #24 and #31). Having reviewed defendants' motion, plaintiff's responses and defendants' replies thereto, and the remaining record, the undersigned submits the following report and recommendation for the Honorable Robert J. Bryan's review.

FACTUAL AND PROCEDURAL BACKGROUND

This case involves a civil rights complaint brought by plaintiff against defendants – all of whom were deputies with the Pierce County Sheriff's Office during the relevant time period – pursuant to 42 U.S.C. § 1983. Specifically, in his amended complaint, plaintiff alleges that his constitutional rights were violated when:

(1) defendants Mark C. Berry and Kristain Nordstrom unlawfully conducted a traffic stop of his vehicle on the basis of an expired registration;

(2) defendants Berry and Nordstrom unlawfully engaged in a vehicle pursuit through a City of Tacoma residential neighborhood while he attempted to elude them;

(3) defendants Berry and Nordstrom used unnecessary force when they performed a precision intervention technique ("PIT") maneuver on his vehicle, and then hit his vehicle twice while it was stopped in a private driveway;

(4) defendant Berry used excessive force by hitting him on the back of his head with a flashlight; and

(5) defendants Berry, Nordstrom and Hardesty intentionally inflicted a substantial amount of pain on him by forcing him to walk on a fractured right knee instead of granting his request for a stretcher to transfer him to a patrol car after he was subdued.

Amended Complaint (Dkt. #15).

On August 4, plaintiff was charged with the crimes of attempting to elude a pursuing police vehicle and of assault in the third degree for intentionally assaulting defendant Berry. Defendants' Appendix "A" (Dkt. #24-3), pp. 1-2, Information. On October 4, 2004, a jury found plaintiff guilty of both crimes. Id., Verdict Form A (Count I) and Verdict Form A (Count II), pp. 17-18. To find plaintiff guilty of the crime of attempting to elude a pursuing police vehicle, the jury was required to find the following elements were proved beyond a reasonable doubt:

(1) That on or about the 3rd day of August, 2004, the defendant drove a motor vehicle;

(2) That the defendant was signaled to stop by a uniformed police officer by hand, voice, emergency light or siren;

(3) That the defendant willfully failed or refused to immediately bring the vehicle to a stop after being signaled to stop;

(4) That while attempting to elude a pursuing police vehicle, the defendant drove his vehicle in a reckless manner[1];

(5) That the pursuing police vehicle was equipped with lights and siren; and

(6) That the acts occurred in the State of Washington.

---

[1]To find plaintiff "drove in a reckless manner," the jury also was required to find that he had "a wanton or willful disregard for the lives or property of others," and that he drove in a manner indicating such a disregard. Id., p. 8, Instruction No. 8. The term "[w]illful" was defined as "acting intentionally and purposely, and not accidentally or inadvertently." Id., p. 9, Instruction No. 9. The term "[w]anton" was defined as "acting intentionally in heedless disregard of the consequences and under such surrounding circumstances and conditions that a reasonable person would know or have reason to know that such conduct would, in a high degree of probability, harm a person or property." Id.

REPORT AND RECOMMENDATION
Page - 2

Id., p. 7, Instruction No. 7.

To find plaintiff guilty of the crime of assault in the third degree, the jury was required to find the following elements beyond a reasonable doubt:

(1) That on or about the 3rd of August, 2004, the defendant assaulted Deputy Mark Berry;

(2) That at the time of the assault Mark Berry was a law enforcement officer or other employee of a law enforcement agency who was performing his or her official duties; and

(3) That the acts occurred in the State of Washington.

Id., p. 11, Instruction No. 11. The jury also was required to find that plaintiff was not entitled to the defense that the force used by him on defendant Berry was lawful. Id., p. 13, Instruction No. 15. Lawful force was defined as follows:

> A person may use force to resist an arrest by someone known by the person to be a police officer only if the person being arrested is in actual and imminent danger of serious injury. The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar circumstances.

Id.

The Court has been provided with portions of the official transcript from plaintiff's criminal trial. While those portions do not provide a complete picture of everything that happened during the incident in question, they do shed substantial further light on the events at issue here. On or about August 3, 2004, at approximately 2:30 in the morning, defendant Berry saw a car drive at a rate of speed that looked to him to be faster than the speed limit. He ran a computer check on the car's license plate, which indicated that the car's tabs were expired. State of Washington v. John Lewis, No. 04-1-03796-6, Verbatim Report of Proceedings ("Verbatim Report of Proceedings"), p. 44, lns. 9-15, 18, attached to Affidavit of Daniel R. Hamilton (Dkt. #28). At the time, the car was being driven by plaintiff, who attempted to elude the police after they tried to stop him.

According to plaintiff, he was driving probably between 20 and 25 miles per hour at the time, which he claims was below the speed limit. At some point, he came to a stop in a driveway, although the car was still running at the time. The car then was binged by one of the defendant's patrol cars while performing a PIT maneuver, which caused it to spin around. At that point, plaintiff's car again was binged by one of the patrol cars causing it to go back to a slope. Defendants' Appendix "B" (Dkt. #24-4), Verbatim Report of

Proceedings, p. 166, lns. 4-7, p. 173, lns. 17-24, p. 230, ln. 5-p. 231, lns. 4, 15-16.

As a result of the PIT maneuver the front of plaintiff's car ended up being face-to-face with one of the patrol cars involved in the maneuver. According to plaintiff, defendants then jumped out with their guns drawn, screaming that they were going to shoot. At that point, in fear for his safety and believing it to be a life and death situation, plaintiff ran from his car. Id., p. 174, lns. 4-14, p. 231, lns. 9-14, 20-24. According to defendant Berry, after plaintiff got out of his car and began to run, he yelled and then continued to yell at plaintiff to stop and also identified who he was and what he wanted him to do. Appendix "C", Verbatim Report of Proceedings, p. 71, lns. 2-6, attached to Defendants' Reply to Plaintiff's Opposition to Summary Judgment Dismissal.

Also according to defendant Berry, while he was pursuing plaintiff who was continuing to run from him, he had his flashlight in his right hand. His left hand remained free. As he and plaintiff were almost to some chicken wire fence present in the vicinity plaintiff turned right, but he did not stop or slow down in response to the defendant Berry's screaming for him to do so. Defendant Berry began to get wrapped up in the fencing, which caused him to start to come down, but he managed to grab hold of the back of plaintiff's shirt collar, intending to yank him back. As he did so, however, plaintiff began to aim half-hearted elbow strikes at him in an attempt to get away. Id., p. 71, lns. 7-11, 17-22, p. 72, lns. 3-8.

As defendant Berry stumbled down because of the chicken wire fence, he saw plaintiff load up his elbow – in what appeared to be an effort to build up greater velocity and power, in contrast to the manner in which the earlier type of elbow strikes were performed – and bring it back straight at him. At this point, defendant Berry was positioned right behind plaintiff's back and a little off to the side, so that his head was about the height of plaintiff's shoulder blade. Defendant Berry looked up and saw plaintiff looking back at him. According to defendant Berry, plaintiff saw very clearly who it was that was on him. Id., p. 72, ln. 24-p. 73, lns. 3, 5-15, 18-21-p. 74, ln. 1.

Immediately after plaintiff looked back at defendant Berry, plaintiff swung his elbow and struck him on the top of his head. Defendant Berry ducked his head down to avoid being struck on his nose, which he felt would have been broken as a result of such a blow. The blow, however, still stunned defendant Berry, although he did not lose consciousness at the time. At that point, defendant Berry was concerned that he did not have much of a target area on plaintiff in light of his position with respect thereto, that he was going to lose consciousness if plaintiff struck him again, and that it appeared plaintiff was loading up to do just

REPORT AND RECOMMENDATION
Page - 4

1  that. Id., p. 73, ln. 25-p. 74, ln. 4-6, 9-12, p. 75, ln. 2.

2    Despite being struck hard on the head, defendant Berry did not lose his grip on plaintiff.  However, 3 he decided that he needed to try and end the fight right away so that it did not escalate further and cause him 4 to have to resort to using his gun.  To that end, and in an attempt to knock him down to the ground, he used 5 good force to hit plaintiff on the top of his head with his flashlight, which was ten to twelve inch-long and 6 made of metal.  Defendant Berry explained his decision to strike plaintiff on the top of his head was due to 7 his inability at the time to strike him anywhere else on his body.  The strike succeeded in knocking plaintiff 8 down, but apparently did not take the fight out of him.  Defendant Berry fell to the ground as well, where 9 plaintiff continued to elbow and kick him. Id., p. 76, lns. 3-17, 19-21-22, p. 77, lns. 2-5, 9-11.

10    At this point, defendant Berry got on top of plaintiff's back so as to put handcuffs on him, all the 11 while continuing to tell plaintiff who he was and to stop resisting.  However, plaintiff continued to try to 12 elbow and kick him away anyway.  Plaintiff continued to struggle even after other sheriff's deputies arrived 13 on the scene.  Eventually defendant Berry and the other sheriff's deputies were able to get plaintiff into 14 handcuffs and then into custody.  Concerning the overall level of force used in subduing plaintiff, defendant 15 Berry felt he did a good job of changing and de-escalating the amount of force used to do so as the situation 16 changed. Id., p. 77, lns. 12-19, 21; Defendants' Appendix "B", Verbatim Report of Proceedings, p. 79, lns. 17 2-5, p. 81, ln. 17-p. 82, ln. 1.

18    After plaintiff was put in handcuffs, defendant Berry perceived that plaintiff had a need for medical 19 treatment, because his head was bleeding due to the flashlight strike, and because he was complaining that 20 one of his knees was hurting quite a bit.  According to defendant Nordstrom, plaintiff kind of limped along 21 as he was escorted to one of the patrol cars.  Plaintiff received treatment from fire department personnel 22 who arrived at the scene of the incident.  According to defendant Berry, while the fire department personnel 23 felt plaintiff would need stitches or staples for his head, they did not think his knee was that badly injured. 24 To be on the safe side, however, plaintiff was taken to the hospital to have the knee checked out. Id., p. 79, 25 lns. 11-25, p. 151, lns. 11-13.

26    Apparently, x-rays of plaintiff's right knee indicated the presence of a fracture thereto.  Plaintiff was 27 treated with a knee immobilizer and told to follow up shortly for further medical evaluation.  A week later, 28 on August 11, 2004, he was noted to be in no distress during his re-evaluation.  While plaintiff had multiple lacerations over his scalp, they were well healed.  Further, although his right knee was still swollen, it was

1  grossly stable. See August 11, 2004 report of Dr. Wyman, attached to Amended Complaint.

2      Again, plaintiff was treated with a knee immobilizer, was told he could be weightbearing on his
3  right knee as tolerated, and informed he should return in five weeks for repeat knee x-rays. Id.  On
4  September 24, 2004, re-testing of plaintiff's right knee showed it to be stable.  X-rays showed it to be
5  healing as well.  The rest of plaintiff's physical examination performed at that time also was noted to be
6  benign.  Thus, plaintiff was allowed to progress out of his knee immobilizer and off of his crutches. See
7  September 24, 2004 report of Dr. Wyman, attached to Amended Complaint.

8      Plaintiff filed his original civil rights complaint with this Court on October 20, 2005. (Dkt. #1, #7
9  and #8).  In response to the Court's orders to show cause, on March 27, 2006, plaintiff filed his amended
10 complaint. (Dkt. #9 and #14-15).  On June 14, 2006, defendants filed a motion to dismiss under Federal
11 Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) (Dkt. #24), which the Court converted into a motion
12 for summary judgment under Fed. R. Civ. P. 56 on July 17, 2006 (Dkt. #31).  Having provided the parties
13 with the opportunity to file a further response and reply with respect to defendants' converted summary
14 judgment motion, and having received them, that motion is now ripe for review.

15     Defendants argue that plaintiff has stated no claim upon which relief may be granted, and that they
16 are entitled to qualified immunity.  The undersigned agrees plaintiff has failed to state a valid claim upon
17 which relief may be granted, and for that reason recommends the Court grant defendants' converted motion
18 for summary judgment.

19 DISCUSSION

20 I.    Standard of Review

21     Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no
22 genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
23 Fed. R. Civ. P. 56(c).  In deciding whether summary judgment should be granted, the Court must view the
24 record in the light most favorable to the nonmoving party and indulge all inferences favorable to that party.
25 Fed. R. Civ. P. 56(c) and (e). When a summary judgment motion is supported as provided in Fed. R. Civ. P.
26 56, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but that party's
27 response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing
28 there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  If the nonmoving party does not so respond,
   summary judgment, if appropriate, shall be rendered against that party. Id.

REPORT AND RECOMMENDATION
Page - 6

1  The moving party must demonstrate the absence of a genuine issue of fact for trial. Anderson v.
2  Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that a genuine
3  issue of material fact exists does not preclude summary judgment. California Architectural Building
4  Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one
5  which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the
6  suit," and the materiality of which is "determined by the substantive law governing the claim." T.W.
7  Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).
8  Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of
9  summary judgment." Id. Rather, the nonmoving party "must produce at least some 'significant probative
10  evidence tending to support the complaint.'" Id. (quoting Anderson, 477 U.S. at 290); see also California
11  Architectural Building Products, Inc., 818 F.2d at 1468 ("No longer can it be argued that any disagreement
12  about a material issue of fact precludes the use of summary judgment."). In other words, the purpose of
13  summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory
14  allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

15  II.    Plaintiff's Traffic Stop Was Not Unlawful

16  Plaintiff argues that in stopping him on the basis of an expired vehicle registration, defendants Berry
17  and Nordstrom violated both state law and his Fourth, Eighth and Fourteenth Amendment rights. Plaintiff's
18  argument, however, is wholly without merit. First, although plaintiff asserts in his responses to defendants'
19  motion that a violation of state statutory law occurred, no such claim was made in his amended complaint.
20  Even if he properly had raised this claim in his amended complaint though, the undersigned finds
21  defendants Berry and Nordstrom[2] committed no violation of state law in making the initial traffic stop.

22  Plaintiff's state law argument is based on his assertion that defendants Berry and Nordstrom had the
23  authority to stop vehicles for the purpose of inspecting their registrations only during the daylight hours.
24  To support his argument, plaintiff cites to RCW 46.64.070, which reads in relevant part:

25      [O]fficers of the Washington state patrol are hereby empowered during daylight hours

---

[2] Indeed, no showing at all has been made that defendant Nordstrom actually participated in the initial traffic stop of which plaintiff complains. See Arnold v. IBM, 637 F.2d 1350, 1355 (9th Cir. 1981) (plaintiff must allege facts showing how individually named defendants caused or personally participated in causing harm alleged in complaint); Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (inquiry is individualized and focuses on duties and responsibilities of each individual defendant whose acts or omissions allegedly caused constitutional deprivation).

REPORT AND RECOMMENDATION
Page - 7

> and while using plainly marked state patrol vehicles to require the driver of any motor vehicle being operated on any highway of this state to stop and display his or her driver's license and/or to submit the motor vehicle being driven by such person to an inspection and test to ascertain whether such vehicle complies with the minimum equipment requirements prescribed . . .

RCW 46.64.070 goes on to state that these powers "are in addition to all other powers conferred by law upon such officers." Defendants Berry and Nordstrom, however, are county sheriff's deputies, not state patrol officers. Thus, this statute does not even apply to them.

In Washington, furthermore, "[i]t is unlawful for a person to operate any vehicle over and along a public highway of" the state, "without first having obtained and having in full force and effect a current and proper vehicle license and display vehicle license number plates therefor." RCW. 46.16.010. As noted above, the evidence shows that prior to stopping plaintiff, defendant Berry conducted a computer check, which showed the license registration for the car plaintiff was driving at the time to be expired. In addition, county sheriff's deputies have the power to "arrest and commit to prison all persons who break the peace, or attempt to break it, and all persons guilty of public offenses." RCW 36.28.010(1). As it is a violation of RCW 46.16.010 to operate a vehicle without first having in full force and effect a current and proper license, it was not improper under state law for defendants Berry and Nordstrom, pursuant to the authority delegated to them under RCW 36.28.010(1), to have stopped plaintiff for this reason.

Plaintiff's claim that defendants violated his Eighth Amendment rights in conducting the initial traffic stop is equally without merit, as that constitutional provision does not apply here. Because plaintiff was not imprisoned at any time during the relevant period at issue in this case, the protections of the Eighth Amendment clearly do not apply. See Whitley v. Albers, 475 U.S. 312, 327 (1986) (Eighth Amendment's protections specifically concerned with unnecessary and wanton infliction of pain in penal institutions). In addition, it is clear that plaintiff's Fourteenth Amendment rights also were not violated. Although not expressly so stated, the undersigned assumes that in invoking the Fourteenth Amendment in his amended complaint, plaintiff was referring to the substantive due process protections afforded thereby.

The Due Process Clause of the Fourteenth Amendment provides that no state shall deprive "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Substantive due process protects individuals from arbitrary and unreasonable government action which deprives any person of life, liberty, or property. Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1234 (9th Cir. 1994). To establish a substantive due process violation, the government's action must have been "clearly

1  arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general
2  welfare." Sinaloa Lake Owners, 882 F.2d 1398, 1407 (9th Cir. 1989) (quoting Village of Euclid v. Ambler
3  Realty Co., 272 U.S. 365, 395 (1926)); Bateson v. Geisse, 857 F.2d 1300, 1303 (9th Cir.1988).

4    As discussed above, however, it was not a violation of state law for defendants Berry and Nordstrom
5  to have stopped plaintiff on the basis of an expired vehicle registration. Indeed, both defendants had the
6  express statutory authority to do so. As such, their decision to stop plaintiff for this reason cannot in any
7  way be seen as being arbitrary and unreasonable, or as having no substantial relation to the public health,
8  safety, morals or general welfare. Accordingly, because plaintiff is unable to make such a showing, he has
9  demonstrated no violation of his Fourteenth Amendment rights.

10   Finally, the undersigned finds no Fourth Amendment violation occurred because of the decision to
11  stop plaintiff on the basis of an expired vehicle registration. Under the Fourth Amendment, plaintiff has the
12  right "to be secure . . . against unreasonable searches and seizures." Peirce v. Smith, 117 F.3d 866, 872 (5th
13  Cir. 1997). The Fourteenth Amendment, however, requires only that police officers have "reasonable
14  suspicion," rather than probable cause, to effect an investigatory traffic stop. United States v. Miguel, 368
15  F.3d 1150, 1153 (9th Cir. 2004) (citation omitted). "Reasonable suspicion is formed by specific, articulable
16  facts which, together with objective and reasonable inferences, form the basis for suspecting that the
17  particular person detained is engaged in criminal activity." Id.; see also United States v. Cortez, 449 U.S.
18  411, 417 (1981) (investigatory stops must be justified by some objective manifestation that person stopped
19  is, or is about to be, engaged in criminal activity).

20   It is reasonable under the Fourth Amendment for a police officer to stop an automobile and to detain
21  the driver of that automobile to check his or her license and registration where "there is at least articulable
22  and reasonable suspicion that" the driver "is unlicensed or the automobile is not registered." Delaware v.
23  Prouse, 440 U.S. 648, 663 (1979) (holding only that persons in automobiles on public roadways may not for
24  that reason alone have their travel and privacy interfered with at unbridled discretion of police officers); see
25  also Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) (no question that initially stopping respondent who
26  was driving automobile with expired license tags in violation of state law was proper); Miguel, 368 F.3d at
27  1152-54 (police officers had reasonable suspicion to stop vehicle due to factually erroneous but reasonable
28  and good faith belief registration had expired based on expiration date in computer database). In this case,
   plaintiff was stopped in large part because the vehicle he was driving had an expired registration. As such,

REPORT AND RECOMMENDATION
Page - 9

the decision to stop plaintiff was reasonable and proper under the Fourth Amendment.

III. No Violation of Law Occurred During the Vehicle Pursuit of Plaintiff

Plaintiff argues in his first response to defendants' motion that in continuing to pursue him through a residential neighborhood of the City of Tacoma after he fled the scene of the initial traffic stop, defendants again violated state law and his Fourth, Eighth and Fourteenth Amendment rights. Once more, it must be noted that plaintiff failed to set forth in his amended complaint these specific state statutory provisions and federal constitutional rights he now alleges were violated. Nevertheless, as with his traffic stop claim, he is unable to demonstrate that a violation of either state or federal law occurred here.

With respect to his state law claim, plaintiff asserts that the City of Tacoma had a "no elude" policy defendants violated by pursuing him from unincorporated Pierce County into the jurisdiction of the City of Tacoma, which also violated his entitlement to be subject to the law of that jurisdiction. Plaintiff, however, has not pointed to, nor provided the Court with, any evidence that such a "no elude" policy in fact exists. The only state statutory provision plaintiff cites to is RCW 69.50.435, which merely deals with violations of the state's controlled substance laws in certain public places or facilities. However, the undersigned fails to see, and plaintiff does not show, what relevance, if any, this statute has to the facts of this case.

As such, the undersigned does not find any state law or federal constitutional violations with respect to plaintiff's allegations concerning jurisdiction. Further, it appears defendants were acting entirely within their delegated authority in continuing to pursue plaintiff. In Washington, it is a crime to attempt to elude a police vehicle:

> Any driver of a motor vehicle who willfully fails or refuses to immediately bring his vehicle to a stop and who drives his vehicle in a reckless manner while attempting to elude a pursuing police vehicle, after being given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a class C felony. The signal given by the police officer may be by hand, voice, emergency light, or siren.

RCW 46.61.024(1). Under state law, it is an affirmative defense to the above if: "(a) A reasonable person would not believe that the signal to stop was given by a police officer; and (b) driving after the signal to stop was reasonable under the circumstances." RCW 46.61.024(2). In fact, however, plaintiff was convicted of attempting to elude a pursuing police vehicle.

Plaintiff's assertion that by pursuing him into the City of Tacoma's jurisdiction, defendants violated his Fourth, Eighth and Fourteenth Amendment rights has no basis in law as well. As explained above, the protections of the Eighth Amendment do not apply here. Also, because the mere fact that a suspect is being

REPORT AND RECOMMENDATION
Page - 10

pursued by law enforcement officials does not rise to the level of a seizure, application of the provisions of the Fourth Amendment likewise is inappropriate. See County of Sacramento v. Lewis, 523 U.S. 833, 836-37 (1998) (police pursuit in attempt to seize suspect does not amount to "seizure" within meaning of Fourth Amendment); California v. Hodari D., 499 U.S. 621, 626-29 (1991) (no seizure where show of authority during chase does not produce stop).

That leaves the Fourteenth Amendment. The Supreme Court continuously has emphasized that "[t]he touchstone of due process is protection of the individual against arbitrary action of government." Lewis, 523 U.S. at 845 (citation omitted). It is "only the most egregious official conduct," however, that "can be said to be 'arbitrary in the constitutional sense.'" Id. at 846 (citation omitted). Thus, to rise to "the cognizable level of executive abuse of power" that would "offend due process," the conduct complained of must be such that it "'shocks the conscience' and violates the 'decencies of civilized conduct.'" Id. (citation omitted). As the Supreme Court in Lewis went on to explain:

> [T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. . . . It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

Id. at 849 (internal citations omitted) (citing Daniels v. Williams, 474 U.S. 327, 331 (1986) ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property.") (emphasis in original)).

As such, "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience," that is necessary to establish a substantive due process violation. Lewis, 523 U.S. at 836. Here, though, plaintiff has not shown that defendants' actions in pursuing plaintiff into the jurisdiction of the City of Tacoma were in themselves shocking to the conscience or in violation of the decencies of civilization. Most significantly, plaintiff has failed to demonstrate that defendants deliberately intended to deprive him of life, liberty or property. See Lewis, 523 U.S. at 836 (no due process violation where police officer causes death through deliberate or reckless indifference to life in high-speed automobile chase aimed at apprehending suspected offender).

IV.   Use of Patrol Car to Perform the PIT Maneuver on and to Hit Plaintiff's Vehicle Did Not Constitute Excessive Use of Force

1   To determine whether the force used by law enforcement officials "to effect a particular seizure is
2   'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the
3   intrusion on the individual's Fourth Amendment interests' against the countervailing governmental
4   interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1,
5   8 (1985) (quoting United States v. Place, 462 U.S. 696, 703 (1983))).  This "balancing of competing
6   interests" has been described as "the key principle of the Fourth Amendment." Garner, 471 U.S. at 8
7   (quoting Michigan v. Summers, 452 U.S. 692, 700 n.12 (1981)).  Since one of the factors in determining
8   whether a particular use of force is excessive "is the extent of the intrusion, . . . reasonableness depends on
9   not only when a seizure is made, but also how it is carried out." Id.; see also Graham, 490 U.S. at 395.

10   A claim of excessive use of force is "properly analyzed under the Fourth Amendment's 'objective
11   reasonableness' standard." Graham, 490 U.S. at 388.  This inquiry, furthermore, "is one of 'objective
12   reasonableness' under the circumstances." Id. at 399.  Thus, "the question is whether the officers' actions
13   are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their
14   underlying intent or motivation." Id. at 397.  "[P]roper application" of the test of reasonableness "requires
15   careful attention to the facts and circumstances of each particular case, including the severity of the crime at
16   issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is
17   actively resisting arrest or attempting to evade arrest by flight." Id. at 396; Garner, 471 U.S. at 8-9 (question
18   is whether totality of circumstances justifies particular type of seizure).

19   Whether a particular use of force is reasonable "must be judged from the perspective of a reasonable
20   officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 ("[T]he . . .
21   standard of reasonableness at the moment applies.").  In addition, the Court's "calculus of reasonableness
22   must embody allowance for the fact that police officers are often forced to make split-second judgments – in
23   circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in
24   a particular situation." Id. at 396-97.  Further, it has been long recognized that the right of law enforcement
25   officials "to make an arrest or investigatory stop necessarily carries with it the right to use some degree of
26   physical coercion or threat thereof to effect it." Id. at 396.

27   Plaintiff argues that it was an excessive use of force for defendants Berry and Nordstrom to perform
28   a PIT maneuver on his vehicle, during the course of which they used their patrol car to hit his vehicle twice

1    while it was stopped in a private residential driveway.[3]  However, it first must be noted, as defendants point
2    out, that plaintiff has not alleged or shown he suffered from any physical harm as a result of defendants use
3    of the PIT maneuver.  This, though, is an essential element of an excessive use of force claim.  See Neague
4    v. Cynkar, 258 F.3d 504, 508 (6th Cir. 2001) (when there is no allegation of physical injury, handcuffing of
5    individual incident to lawful arrest is insufficient as matter of law to state claim of excessive force under
6    Fourth Amendment); Hannula v. City of Lakewood, 907 F.2d 129, 131-32 (10th Cir. 1990) (under due
7    process standard, factors relevant to whether use of force is excessive include extent of injury inflicted, and
8    where injury is minimal, force creating that injury also likely to be minimal); Busch v. Torres, 905 F.Supp.
9    766, 772 (C.D.Cal. 1995) (to prevail on excessive use of force claim requires proof of significant physical
10   injury) (quoting Johnson v. Morel, 876 F.2d 477, 480 (5th Cir.1989)).

11        Second, the amount of force defendants appear to have used in performing the PIT maneuver on
12   plaintiff's vehicle was not excessive.  In Washington, it is not unlawful for law enforcement officials to use
13   force on a person whenever necessary in the performance of a legal duty.  RCW 9A.16.020.  In addition,
14   such officials "may use all necessary means" to effect an arrest, "[i]f after notice of the intention to arrest"
15   the individual either flees or forcibly resists.  RCW 10.31.050.  As the facts show that plaintiff was fleeing
16   defendants after they properly had attempted to stop him for driving a vehicle with an expired registration,
17   they were justified under the above statutory provisions in using force to effect his arrest.

18        The PIT maneuver has been defined to be "a driving technique designed to stop a fleeing motorist
19   safely and quickly by hitting the fleeing car at a specific point on the vehicle, which throws the car into a
20   spin and brings it to a stop."  Harris v. Coweta County, 433 F.3d 807, 816-17 (11th Cir. 2005).  Such a
21   definition "assumes that the maneuver will be executed at lower speeds by properly trained officers, and
22   therefore can terminate a flight 'safely.'"[4]  Id. at 817.  It is true that "using a vehicle to stop and apprehend a

---

[3] Once more, the record fails to show defendant Nordstrom caused or personally participated in causing the performance of the PIT maneuver or the hitting of plaintiff's vehicle, upon which the excessive use of force claim is based.

[4] The Eleventh Circuit went on to note that the PIT maneuver "requires a set of defined circumstances in order for it to be performed safely (i.e., at low speeds on wide straightways, on dry pavement by a properly trained driver," that it "is not applicable in every situation," that "the key to its effective use is to carefully choose a favorable spot before attempting" it "and to first consider the possible effects on other traffic and pedestrians," and that "[u]tilized at speeds of 35 mph or less," it "improves officer and public safety by removing the threat of pursuit as quickly and safely as possible."  Id. (citations omitted).

suspect is a seizure" under the Fourth Amendment,[5] and that "a car can be a deadly weapon." Id. at 812-13 (Fourth Amendment seizure occurs where police intended and did cause car collision); Brosseau v. Haugen, 543 U.S. 194, 200 (2004) (citation omitted).

Where there is "probable cause to believe that the suspect poses a threat of serious physical harm, either to the" law enforcement official "or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Brosseau, 543 U.S. at 598 (citation omitted). "'Deadly force is force that creates 'a substantial risk of causing death or serious bodily injury,'" which "cannot be employed in a situation that requires less-than-lethal force." Harris, 433 F.3d at 814, 818 (citation omitted). However, "[l]ike other instrumentalities, the use of an automobile cannot be construed in every circumstance as deadly force." Id. Thus, while "ramming" a car "at high speeds" can constitute "use of deadly force," a PIT maneuver, when properly employed, does not. Id. at 815 and n.8 (high-speed chase of suspect fleeing after traffic infraction does not amount to "substantial threat" of imminent physical harm justifying use of deadly force).

Here, the record before the Court shows that plaintiff's car had come to a stop before defendants performed the PIT maneuver. Thus, unlike in Harris, this case does not involve the ramming of a car during at high-speed chase. Further, plaintiff has not come forth with any specific facts showing the PIT maneuver was performed other than in a proper manner, or otherwise in a manner that was either unreasonable or unsafe. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (party opposing summary judgment motion must go beyond pleadings and designate specific facts showing presence of genuine issue for trial). Indeed, the fact that he has not alleged or shown he suffered any physical injury as the result of the performance of the PIT maneuver or his car being hit, strongly indicates the maneuver was performed properly.[6]

V. **Defendant Berry Did Not Use Excessive Force in Striking Plaintiff With His Flashlight**

In his amended complaint, plaintiff claims defendant Berry used excessive, deadly force in striking

---

[5] Hence, because a vehicle was used in this case to, and indeed in fact did, effect a stop, the protections of the Eighth and Fourteenth Amendment do not apply. See Lewis, 523 U.S. at 843 (substantive due process analysis is appropriate only where claim is not covered by Fourth or Eighth Amendments); Whitley, 475 U.S. at 327 (Eighth Amendment's protections specifically concerned with unnecessary and wanton infliction of pain in penal institutions). Accordingly, plaintiff's claims that his rights under these two constitutional provisions were violated, must fail.

[6] As such, plaintiff's claim that defendants' actions amounted to criminal negligence, as defined in RCW 9A.08.010, also has no merit. See RCW 9A.08.010(1)(d) ("A person is criminally negligent or acts with criminal negligence when he fails to be aware of a substantial risk that a wrongful act may occur and his failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable man would exercise in the same situation.").

REPORT AND RECOMMENDATION
Page - 14

him with his flashlight. In his responses to defendants' motion for summary judgment, plaintiff asserts that all three named defendants violated his Fourth, Eighth and Fourteenth Amendment rights by assaulting him with their flashlights. First, it must be noted that plaintiff has not come forth with any specific facts showing that either defendant Hardesty or defendant Nordstrom struck him with their flashlights. Indeed, defendant Nordstrom testified at plaintiff's criminal trial that she had no reason to strike him, nor did she see anyone else striking him at the time. Defendants' Appendix "B", p. 151, 1ns. 14-17. Second, the facts, as set forth above, clearly show plaintiff was in the grasp of, i.e., "seized" by, defendant Berry when the flashlight strike occurred, thereby bringing this claim squarely within the contours of the Fourth Amendment.

In addition, the nature and level of force used by defendant Berry to subdue plaintiff was certainly reasonable. That is, after attempting to elude defendants in his car, and after his vehicle was stopped, plaintiff continued to try and get away. Plaintiff purposefully and forcefully hit defendant Berry on the head causing injury, and was attempting to do so again, when defendant Berry used his flashlight to stop him from actively resisting and attempting to evade arrest by flight. See Graham, 490 U.S. at 396. Defendant Berry, furthermore, struck plaintiff on the head, because it was the only area of plaintiff's body reasonably available to him under the circumstances, and did so only because he legitimately feared he was about to be hit again by plaintiff's elbow, thereby opening the possibility of further endangering the safety of himself, as well as that of others who were, or about to be, present at the scene.

VI.  Plaintiff's Fails to State a Valid Claim Regarding the Medical Treatment He Received

Plaintiff claims defendants Berry, Nordstrom and Hardesty deliberately and intentionally inflicted a substantial amount of pain on him, by forcing him to walk on his injured right knee after he was subdued, rather than provide him with the stretcher he says he requested. This, plaintiff alleges in his amended complaint, violated his Eighth Amendment right not to be subject to cruel and unusual punishment.[7] The undersigned disagrees.

In the context of medical treatment, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." City of

---

[7] Plaintiff also asserts in his responses to defendants' motion that his Fourth and Fourteenth Amendment rights were violated as well. As explained below, however, it is under the Fourteenth Amendment Due Process Clause that plaintiff's claim here is to be evaluated.

REPORT AND RECOMMENDATION
Page - 15

Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983) (citation omitted). That is, the state "does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Id. Therefore, because there has been "no formal adjudication of guilt" against plaintiff "at the time he required medical care, the Eighth Amendment has no application" to his claim here. Id.

Under the Due Process Clause, on the other hand, "the responsible government or governmental agency" must "provide medical care to persons . . . who have been injured while being apprehended by the police." Id. Indeed, "the due process rights of" such persons "are at least as great as the Eighth Amendment protections available to a convicted prisoner." Id. Thus, while "[c]laims by pretrial detainees are analyzed under the Fourteenth Amendment," instead of the Eighth Amendment, "[b]ecause pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, . . . the same standards" are applied.[8] Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or that involves "the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 102-03 (1976) (citations omitted). Prison officials' "[d]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." Id. at 104 (internal citation omitted); see also Hudson v. McMillan, 503 U.S. 1, 6 (1992). As such, the state "has an obligation to provide medical care" to those within its custody, and therefore "cannot be deliberately indifferent to the medical needs of its prisoners." Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991). "Not every breach of that duty," however, "is of constitutional proportions." Lopez, 203 F.3d at 1131 (quoting Estelle, 429 U.S. at 104 (1976)).

To state a cognizable Eighth Amendment claim in this context, a prisoner thus "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429

---

[8] Those who have been arrested, but not yet detained in jail pending trial, are treated as "pretrial detainees" for Fourteenth Amendment analysis purposes. See Palacois v. City of Oakland, 970 F.Supp. 732 (N.D.Cal. 1997) (treating plaintiff claiming police officers violated his constitutional rights by taking him straight to jail rather than transporting him to hospital for medical attention for alleged injuries sustained during arrest as pretrial detainee); Carnell v. Grimm, 872 F.Supp. 746 (D.Haw. 1994) (police officers have constitutional duty not to remain deliberately indifferent to need for medical treatment of individual in their custody but not yet placed in detention) (citing Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986)).

REPORT AND RECOMMENDATION
Page - 16

1  U.S. at 106; see also Lopez, 203 F.3d at 1131 (deliberate indifference to serious medical needs must be
2  shown); McGuckin, 974 F.2d at 1059. Prison officials are "deliberately indifferent" to "serious medical
3  needs" when they "deny, delay, or intentionally interfere with medical treatment." Lopez, 203 F.3d at
4  1131. Deliberate indifference also may be shown "by the way in which prison physicians provide medial
5  care." McGuckin, 974 F.2d at 1059.

6  On the other hand, "[m]ere negligence in diagnosing or treating a medical condition, without
7  more," does not implicate the Cruel and Unusual Punishment Clause of the Eighth Amendment. Lopez,
8  203 F.3d at 1131; see also O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990) (isolated occurrences of
9  neglect do not amount to constitutional violation); Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998)
10 (mere negligence in providing medical care does not violate constitution). By contrast, "a finding that the
11 defendant repeatedly failed to treat an inmate properly or that a single failure was egregious strongly
12 suggests that the defendant's actions were motivated by 'deliberate indifference' to the prisoner's medical
13 needs." McGucken, 974 F.3d at 1060-61. Thus, the determination as to whether deliberate indifference
14 exists "involves an examination of two elements: the seriousness of the prisoner's medical need and the
15 nature of the defendant's response to that need." Id., 974 F.2d at 1059.

16 A "serious" medical need will be found to exist "if the failure to treat a prisoner's condition could
17 result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id. (quoting Estelle,
18 429 U.S. at 104). The following examples are indications that a prisoner's need for medical treatment is
19 "serious":

20 > The existence of an injury that a reasonable doctor or patient would find important and
21 > worthy of comment or treatment; the presence of a medical condition that significantly
>   affects an individual's daily activities; or the existence of chronic and substantial pain.

22 Id. at 1059-60. As noted above, deliberate indifference to a prisoner's serious medical need requires "a
23 purposeful act or failure to act on the part of the defendant." Id. at 1060. In other words, "[a] defendant
24 must purposefully ignore or fail to respond to a prisoner's pain or possible medical need." Id.

25 The facts of this case do not rise to the level of "deliberate indifference" found by the courts to be
26 necessary in order to constitute a violation of the Eighth or Fourteenth Amendments. Due to the injuries
27 plaintiff suffered during the course of his arrest, defendant Berry perceived a need for medical treatment.
28 Accordingly, the fire department was summoned, which determined that while plaintiff would need stitches
   or staples for his head wound, his right knee was not really that hurt. Nevertheless, to be safe, they decided

REPORT AND RECOMMENDATION
Page - 17

to take him to the hospital to have that knee checked out.

Plaintiff alleges defendants deliberately intended to inflict pain on him by making him walk to one of their patrol cars instead of providing him with the stretcher he requested. As defendant Nordstrom testified, however, at most plaintiff seemed to "kind of limp along." Defendants' Appendix "B", p. 151, lns. 11-13. As noted above, furthermore, the fire department did not think his right knee was that badly hurt. Plaintiff claims the medical records attached to his amended complaint corroborate his allegations of deliberate or intentional infliction of pain. Although those records do show he fractured his right knee, they also reveal the knee was grossly stable and could withstand weightbearing within a relatively short period of time. This hardly constitutes evidence of an intent to delay, deny or interfere with his serious medical needs.[9]

VII.   Qualified Immunity

Under the doctrine of qualified immunity, state officials "performing discretionary functions [are protected] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Somers v. Thurman, 109 F.3d 614, 617 (9th Cir. 1997). To determine whether a state official is entitled to qualified immunity, the court must perform a two part inquiry. First, the court considers "whether the law governing the official's conduct was clearly established." Somers, 109 F.3d at 617. If the law was not clearly established at the time, "the official is entitled to immunity from suit." Id.

---

[9]This case thus is closely analogous to Walker v. Butler, 967 F.2d 176 (5th Cir. 1992), where the Fifth Circuit declined to find deliberate indifference to a prisoner's medical needs on facts substantially similar to those here:

> McMurtry argues that his conduct did not amount to deliberate indifference because he did not know that Walker had broken his ankle and because he actually escorted Walker to the hospital. . . .
>
> A prison guard is deliberately indifferent if he intentionally denies or delays access to medical care. . . . Walker was not denied medical treatment and there is no proof that medical treatment was delayed as a result of McMurtry's decision to make Walker walk to the hospital. Walker argues that McMurtry exhibited deliberate indifference by forcing him to walk to the hospital, rather than calling the medical personnel to the cafeteria.
>
> Deliberate indifference is a legal conclusion which must rest on facts evincing wanton actions on the part of the defendant. . . . Wantonly means having a reckless disregard for the rights of others. . . . We hold that the district court erred in concluding that McMurtry acted with deliberate indifference. His decision to make Walker walk to the hospital to be treated was not wanton and did not involve a reckless disregard of Walker's rights.

Id. at 178 (internal citations omitted).

REPORT AND RECOMMENDATION
Page - 18

If the law was so established, the court next asks whether "under that law, a reasonable official would have believed the conduct was lawful." Id. Thus, "an official is denied qualified immunity only if the law was clearly established and a reasonable official could not have believed the conduct was lawful." Id.

The above inquiry "generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'" Grossman v. City of Portland, 33 F.3d 1200, 1208 (9th Cir. 1994) (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987)). To defeat a claim of qualified immunity, the unlawfulness of the state official's conduct must be "apparent." Id. (citing Anderson, 483 U.S. at 640). This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (citation omitted); Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001). Such an "accommodation for reasonable error" has been made "because 'officials should not err always on the side of caution' because they fear being sued." Hunter, 502 U.S. at 229 (citation omitted).

Prior to determining whether defendants are entitled to qualified immunity, however, the Court must first determine if plaintiff has "alleged the deprivation of an actual constitutional right at all." Conn v. Gabbert, 526 U.S. 286, 290 (1999). If not, the issue of qualified immunity does not come before the Court. Id. at 293. When making this initial determination, the Court must view the facts "in the light most favorable to the party asserting the injury." Saucier v. Katz, 533 U.S. 194, 201 (2001). Here, as discussed above, plaintiff has failed to adequately alleged the deprivation of an actual constitutional right with respect to any of his claims. As such, it is not necessary to determine whether defendants are entitled to qualified immunity, and the undersigned declines to do so.

## CONCLUSION

Defendants have met their burden of demonstrating that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Plaintiff has failed in all instances to allege facts sufficient to form a constitutional violation with respect to any of the claims raised in his amended complaint. Accordingly, the undersigned recommends that the Court GRANT defendants' converted motion for summary judgment (Dkt. #24 and #31), and that it dismiss all remaining motions currently pending before it.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedures, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections

1 thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for
2 purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by
3 Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 8, 2006**, as
4 noted in the caption.

5     DATED this 13th day of November, 2006.

          /s/ Karen L. Strombom
          Karen L. Strombom
          United States Magistrate Judge